J-S19015-25                    2025 PA Super 116

| IN THE INTEREST OF: N.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: D.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 521 EDA 2025 |

Appeal from the Order Entered February 4, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0042506-2010

| IN THE INTEREST OF: N.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 522 EDA 2025 |

Appeal from the Decree Entered February 4, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000318-2024

BEFORE:  PANELLA, P.J.E., STABILE, J., and BECK, J.

OPINION BY PANELLA, P.J.E.:                    **FILED JUNE 6, 2025**

In these consolidated appeals,[1] D.S. ("Mother") appeals from the decree entered in the Philadelphia County Court of Common Pleas terminating her parental rights to 15-year-old N.A.S., born in February 2010 ("Child"), and

_____

[1] The Court consolidated the cases sua sponte on March 10, 2025.

the order changing Child's permanency goal to adoption.[2] After our careful review, we affirm.

We take the following background facts and procedural history from the trial court's March 12, 2025 opinion:

> The Philadelphia Department of Human Services ("DHS") first became aware of this family after a General Protective Services ("GPS") report was filed in August of 2022. The report indicated that the family's house was [in] "deplorable" condition[. Specifically, it lacked gas and water services, was dirty with clothing and debris, had no food in the refrigerator or cabinets, no beds, an inoperable, foul-smelling toilet, and a serious gnat and fly infestation. The report further stated Mother] had untreated mental health issues [and was involuntarily hospitalized at Temple Hospital for mental health treatment], and [Child] was habitually and frequently missing school[, having missed a total of 55 days. Mother's family believed she was unable to provide appropriate care and supervision for Child, and Child's paternal[3] grandmother ("Grandmother") had assumed physical custody of her]. Because of those issues, [Child] was adjudicated dependent on August 17, 2022 based upon [Mother's] then present inability. Since the adjudication, [Child] has remained in DHS custody. [Child] is currently placed in a kinship home with [Grandmother, where Child's 6-year-old brother also has been placed].
>
> [Mother] was given Single Case Plan objectives ("SCP's") at the beginning of this case with the goal being reunification with [Child]. [Mother's] SCP's were: (1) complete a parenting class at the Achieving Reunification Center ("ARC"); (2) find and maintain employment, (3) complete an anger management class; (4)

_____

[2] Child's Father is deceased. **See** Permanency Review Order, 4/5/25, DHS Exhibit 2, Father's Death Certificate.

[3] The Appellant's Brief refers to Grandmother as being the maternal grandmother. **See** Appellant's Brief, at 5, 9. However, our review of the record confirms she is Child's paternal grandmother, and that Child's younger brother, who was not the subject of the termination hearing, also has been placed in the same home. **See** N.T., 2/5/25, at 5-7; Permanency Review Order, 8/20/24, at 2.

participate in mental health treatment; (5) follow all recommendations for medication management; (6) attend supervised visits with [Child]; and (7) sign all consents and releases as necessary for the case. [Mother was advised that, to achieve reunification with Child, all objectives would have to be satisfied.]

[Tyshee Brown, t]he Community Umbrella Agency ("CUA") worker assigned to this family [for the last 2 years] testified that, since [Child] has been in DHS care, [Child] has maintained that she wants no contact with [Mother]. Notably this means that [Mother] has had no visits with [Child] for the life of this case. The CUA worker also testified that [Mother] has failed to complete any of her SCP's besides completing an anger management class. [Mother's] direct testimony, however, was that she has been engaged in therapy, completed the anger management class, a parenting class, and found suitable housing for her and [Child]. [Mother] also testified that she is taking mental health medications as prescribed by her psychiatrist. At trial, the court found [Mother's] testimony to be not credible when juxtaposed with the testimony from the family's CU worker. Upon the close of the testimony, th[e] court found clear and convincing evidence to terminate [Mother's] parental rights as to [Child, pursuant to 23 Pa. C.S.A. § 2511(a)(1), (2), (5) and (8). The court also changed Child's permanency goal to adoption]. On February 5, 2025, [Mother] appealed th[e] court's ruling by filing a timely notice of appeal as well as a concise statement of errors[. *See* Pa.R.A.P. 1925(a)(2)(i), (b).]

Trial Court Opinion, 3/12/25, at 1-3 (footnotes omitted).

On appeal, Mother raises 2 issues for our review:

1.    Whether the trial court committed reversible error, when it involuntarily terminated mother's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa. C.S.A. § 2511(a)(1), (2), (5) and (8).

2.    Whether the trial court committed reversible error when it involuntarily terminated mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical, and emotional needs of the

child as required by the Adoption Act, 23 Pa. C.S.A. § 2511(b).

(Appellant's Brief, at 8).

Our standard of review in cases involving the involuntary termination of parental rights is well settled.

> [A]ppellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (quotation marks and citations omitted).

Section 2511 of the Adoption Act, which governs the involuntary termination of parental rights, requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. First, the trial court must determine whether the parent's conduct supports termination under 1 of the 11 enumerated grounds in Section 2511(a). If the court determines that the petitioner has established grounds for termination under Section 2511(a), the court then will assess the petition under Section 2511(b), which focuses on the needs and welfare of the child. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The petitioner must satisfy both Sections 2511(a) and (b) by clear and convincing evidence before a court will involuntarily terminate a parent's rights. *See Interest of M.E.*, 283 A.3d at 830.

In this case, the court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). However, to affirm the order, we only need to agree with the court's decision as to any one subsection of Section 2511(a), in addition to Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, we will focus our discussion on Sections 2511(a)(1) and (b), which provide:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>>
>> ...

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

The analysis of Section 2511(a)(1) focuses on the conduct of the parent sustained for at least a six-month period prior to the filing of the petition, which reveals a settled purpose of relinquishing parental claim to a child or a failure to perform parental duties. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2000).

Parental duty is best understood in relation to the needs of the child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty, which requires affirmative performance… [P]arental duty requires that a parent exert himself to take and maintain a place of importance in the child's life... A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles… Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [their] physical and emotional needs.

*In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citation omitted).

"Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights," a three-part inquiry follows:

- 6 -

"(1) the parent's explanation for … her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." *In re: Z.S.W.*, 946 A.2d 726, 730 (Pa. Super.2008) (citation omitted). "To be legally significant, the post-abandonment contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to undertake the parental role. The parent wishing to re-establish [her] parental responsibilities bears the burden of proof on this question." *In re Z.P.*, 994 A.2d at 1119 (citation and brackets omitted).

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *T.S.M.*, 71 A.3d at 267.

In support of the Section 2511(a)(1) analysis, Mother argues she did not demonstrate a settled purpose of relinquishing her parental rights to Child where the hearing testimony established Mother was working toward completing her SCP goals. *See* Appellant's Brief, at 15. She maintains she "has done her best" to be consistent with her SCP objectives and termination is premature where there has not been any family therapy. *See id.* We disagree.

We note first that Mother's argument ignores that the court found Mother's testimony completely at odds with Brown's and incredible. **See** Trial Court Opinion, 3/12/25, at 3. "When a trial court makes a 'close call' in a fact-intensive case involving … the termination of parental rights, the appellate court … should not search the record for contrary conclusions or substitute its judgment for that of the trial court." **In the Interest of S.K.L.R.**, 256 A.3d 1108, 1124 (Pa. 2021). "Because trial courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this arena, appellate courts defer to trial courts' first-hand observations as they relate to factual determinations." **Id.** at 1129.

The credible testimony at the termination hearing supports the trial court's findings.

Brown testified Child was removed from Mother's care due to a GPS report of deplorable housing conditions, Mother' untreated mental health issues, and Child missing school. **See** N.T., 2/5/25, at 36. Child was adjudicated dependent on August 17, 2022. Since that time, Child has remained in DHS custody and in kinship care with Grandmother, clearly significantly longer than 12 months. **See id.** at 41. To reunify with Child, Mother was required to address the following SCP objectives: 1) participate in ARC for parenting, 2) obtain and maintain employment, 3) address anger management 4) participate in mental health treatment, 5) follow all

recommendations for medication management, 6) participate in supervised visitation; and 6) sign all consents and release forms. ***See id.*** at 37.

According to Brown, Mother refused to meaningfully engage with her SCP goals for most of the time Child was in DHS care. ***See id.*** at 37-38. Notably, Mother only engaged with her primary objective of mental health treatment beginning in June 2024, which was 2 months prior to the filing of the termination petition and 22 months after Child was first adjudicated dependent. ***See id.*** at 38-39, 47. Mother completed an anger management course, but she only began the course the same month that DHS filed the termination petition, August 2024. ***See id.*** at 40, 62-63. While Mother began a parenting course in October 2024, this was months after the termination petition had been filed and over 2 years after Child was removed. ***See id.*** at 47, 55. She did not explain why she waited years to start the course or why she had not completed it. ***See id.*** As for her employment objective, Mother testified that, although her temp agency had been calling to offer her work, she had not worked since "last Thanksgiving," i.e., over 2 months prior to the termination hearing. ***Id.*** at 53-54. Brown testified Mother has not provided employment verification in "quite some time." ***Id.*** at 38. Mother also failed her objective to sign all necessary consents. For example, Brown confirmed that Mother did not sign the authorization for Child's gallbladder surgery in summer 2023, resulting in the appointment of a medical decision maker for Child. ***See id.*** at 44-45.

Despite Mother's assertions that she was engaged with medication management, Brown testified that she had no confirmation of Mother's engagement beyond a list of medications included in her Temple Hospital discharge paperwork and a prescription that Mother showed Brown in July 2024. *See id.* at 39, 47. Mother admitted that she missed her last appointment with her psychiatrist, but did not explain why. *See id.* at 57.

Finally, Mother has not visited with Child in over 2 years because the visitation, which remained supervised throughout the case, was at Child's discretion and, due to Mother's actions and treatment of Child, Child did not want any contact with her. *See id.* at 37-38, 46, 48. Over the 2-year period, Mother had not met any of Child's most basic needs, including ensuring Child attended school and medical appointments, providing authorization for Child to get her required gallbladder surgery, providing any financial support, or providing her with comfort and love. Instead, Child looks to Grandmother as her primary parental figure. *See id.* at 43-44.

Although Mother argues termination is premature because of the lack of family therapy, Brown testified she explored the possibility of family therapy, but that Child refused because their relationship had so deteriorated. *See id.* at 48. In fact, the trial court examined the possibility of family therapy at length:

> THE COURT: Let me ask a question. … For the duration of this case, [Child] has not been interested in either individual therapy or family therapy or visitation with mom[,] despite any efforts mom may or may not have put forth. Do you think that her

interest in family therapy could possibly change, if that was so that termination would be the wrong thing to do?

[Child's Guardian ad litem ("GAL")]: No, Your Honor.

THE COURT: Why?

[Child's GAL]: [Child] has been consistent throughout that the parental bond she has and wanted [is] with her grandmother[;] that she does not want to see or interact with her mother. It's really difficult for her when this case was opened in August of 2022, and that's been a substantial amount of time—

THE COURT: — my question is, it opened in 2022 and [Child] has had absolutely no therapy, and since, we're talking at that time she was 12 years old, do you think the lack of therapy strengthened her position, and it could have been a detriment to reunification, and if so[,] do you think we should try again, or give therapeutic another go.

[Child's GAL]: No, You Honor, I don't[. Child] has had ample opportunity to engage in therapy if she wanted it. It's noted she was 12 when it came in, so therapy could have been something required of her before the age of 14 and it wasn't. I think all along everyone has understood [Child]'s position that she did not and does not want a relationship with her mother, and we continue to believe it is in her best interest for [Mother's] rights to be terminated and for [Child] to stay with [Grandmother].

In fact, you heard CUA's testimony today that [Child] would be harmed if this process is dragged out any further.

*Id.* at 67-69. After hearing argument from Mother's counsel on the issue, the court found that therapy can no longer be forced at this juncture. ***See id.*** at 69.

Based on this record, the evidence supports the trial court's conclusion that Mother both evidenced a settled purpose to relinquish parental claim and failed to perform parental duties for Child, given her lack of compliance and

- 11 -

progress with her SCP objectives. We join the court in its observation that Mother is making some effort, and might have completed her goals if Child had any interest in maintaining a relationship, but that this "doesn't necessarily matter." *Id.* at 67. The fact remains that Mother has had no contact with Child in 2 years, without credible explanation has failed to complete all SCP goals nearly 3 years after Child was removed from her custody, and Child would be harmed if the process were delayed any longer. Therefore, the evidence supports the termination of Mother's parental rights pursuant to Section 2511(a)(1).

Having found sufficient evidence to support termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), we next consider whether the record supports the trial court's finding that termination was appropriate pursuant to 23 Pa.C.S.A. § 2511(b). Mother argues she has been unable to regain custody of Child because visits were at Child's discretion and no family therapy had been imposed. *See* Appellant's Brief, at 19.

Section 2511(b) primarily considers " the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). When analyzing Section 2511(b):

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied

- 12 -

mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the child is in a pre-adoptive home and whether she has a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task. …

***Interest of K.T.***, 296 A.3d 1085, 1105-06 (Pa. 2023) (citations, brackets and quotations marks omitted).

While our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child, the Court has explained that "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." ***J.M.***, 991 A.2d at 324 (citation omitted). Our Supreme Court has reiterated, "[i]t is only a necessary and beneficial bond, after all, that should be maintained." ***K.T.***, 296 A.3d at 1109. The ***K.T.*** Court described the "severance of a necessary and beneficial relationship [as] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." ***Id.*** at 1109-10 (citations omitted). It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." ***M.E.***, 283 A.3d at 839 (citation omitted). We will not disturb the court's assessment if its factual findings are supported by the record. ***See id.***

Testimony from the family's CUA worker at the February 4, 2025 termination of parental rights hearing was that neither [Mother] nor [Child] are in a place where successful reunification would happen. [Child], at the time of the termination of parental rights hearing, is fifteen years old and has refused to see [Mother] for the life of the case, over two years. Conversely, CUA testimony about [Grandmother] was that [Child] has a strong parent/child bond with [Grandmother], who has also been meeting [Child's] basic needs for the life of the case. Further testimony from the CUA worker established that [Child] is stable where she is placed and that it would be harmful for [Child] if she were removed from [Grandmother's] care.

Trial Court Opinion, 3/12/25, at 7 (footnotes and quotation marks omitted).

We discern no abuse of discretion.

Brown testified that reunification would not be beneficial for Child because Child does not want to be with Mother. *See* N.T., 2/4/25, at 40. Child is in ninth grade and receives first honors. *See id.* at 43. Grandmother meets Child's needs and provides Child with safety and stability. *See id.* at 41-42. Grandmother is an adoptive resource, and Child wants to be adopted by her. *See id.* Child and Grandmother are well-bonded, and Child looks to Grandmother, whom she calls, "mom-mom," for parental comfort. *See id.* at 42. Child is current on all medical, dental, and vision care. *See id.* Brown testified that adoption is the most appropriate permanency goal for Child because Child is comfortable where she is and bonded with Grandmother. *See id.* at 43. Brown maintained that Child would not suffer irreparable harm if Mother's parental rights were terminated, but that she would suffer harm if removed from Grandmother's care because that is whom Child considers her parent and to whom she looks for comfort, needs, and stability. *See id.* at 44.

- 14 -

Child's guardian ad litem ("GAL"), Morgen Black-Smith, Esquire,[4] testified that the termination of Mother's parental rights is in Child's best interest so that Child can permanently remain with Grandmother. *See id.* at 68-69. Attorney Black-Smith opined that holding this case for family therapy would not be advisable because Child has been with Grandmother since she was 12 years old, Child has not seen Mother for years, and Child wants to stay with Grandmother. *See id.* at 68. Counsel opined termination of Mother's parental rights and Child's adoption would be in Child's best interest because it would best serve her needs and welfare. *See id.* at 66, 69. There is no evidence of a bond between Child and Mother, and Child is in a pre-adoptive home where she has a strong parental bond with Grandmother. *See id.* at 67. In the GAL's opinion, Child would be harmed if this is dragged out any further, and Child should be freed for adoption. *See id.* at 69.

Child's legal counsel, Jacqueline Chandler, Esquire, testified Child has consistently communicated she wants to be adopted by Grandmother and was distressed because this process was taking so long. *See id.* at 52, 69. Counsel stated Child has been in a stable and comfortable environment with Grandmother, Child is an honor roll student, and her bond with Mother has

_____

[4] The trial court interchangeably calls Attorney Black-Smith and Attorney Chandler Child's GAL. However, a review of the trial court docket reveals that Attorney Chandler was appointed as Child's legal counsel and the Support Center for Child Advocates, for whom Attorney Black-Smith provides services, was appointed as the GAL. *See* 23 Pa.C.S.A. § 2313; Docket Number CP-51-DP-0042506-2010, at 4.

been broken. *See id.* at 69. Counsel agrees that termination of parental rights so Child can be adopted would best serve Child. *See id.*

Based on the foregoing, the trial court properly found there was clear and convincing evidence that termination of Mother's parental rights would best serve Child's needs and welfare pursuant to 23 Pa.C.SA. § 2511(b).

In the nearly 3 years of this case, Mother still has not completed all her SCP objectives. Some of the goals she did not even start until over 2 years after they had been established. Importantly, Mother has not seen 15-year-old Child for 2 years and, although Mother claims this case should be held in abeyance for family therapy, the CUA explored this option without success and there is absolutely no evidence of record that Mother ever sought such therapy. Child needs permanency and stability. She has lived with Grandmother for the life of this case, is thriving, and wants to be adopted. The trial court properly found it is in Child's best interest that Mother's parental rights be involuntarily terminated.[5]

We affirm the decree terminating Mother's parental rights and the order changing Child's permanency goal to adoption.

Decree and Order affirmed.

---

[5] Given our decision to affirm the trial court's termination decree, any challenge to the goal change order is moot. *See In re D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/6/2025</u>